**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **FEDERAL DEPOSIT INSURANCE COMPANY, in its capacity as receiver for NETBANK, FSB,**<br>**Plaintiff,**<br>**v.**<br>**FIRST AMERICAN TITLE INSURANCE COMPANY,**<br>**Defendant.** | **1:10-cv-3032-WSD** |

**OPINION AND ORDER**

This matter is before the Court on Plaintiff's Motion for Reconsideration of Summary Judgment Ruling [63] ("Motion for Reconsideration").

## I. BACKGROUND

This case arises out of alleged fraud committed by a closing agent in connection with a mortgage loan transaction. Plaintiff Federal Deposit Insurance Company, in its capacity as receiver for NetBank, FSB, ("Plaintiff"), the successor-in-interest to the mortgage lender, alleges that Defendant First American Title Insurance Company ("Defendant"), the title insurer for the mortgage, is liable to Plaintiff for the fraud because (i) Defendant agreed to indemnify the lender for the closing agent's fraud and (ii) Defendant is vicariously liable for the closing

agent's fraud. In an order entered March 15, 2012 [61] (the "Summary Judgment Order"), the Court granted summary judgment for Defendant on both claims. On April 12, 2012, Plaintiff filed its Motion for Reconsideration asking the Court to vacate the Summary Judgment Order and to set the case for trial.

A. Factual Background[1]

In December 2005, Anthony Lewis ("Lewis") obtained two mortgages, totaling $608,000, to buy real property in Jonesboro, Georgia from William and Pamela Kreamer (the "Kreamers"). Plaintiff's once-removed predecessor-in-interest, Meritage Mortgage Corporation ("Meritage"), was the mortgage lender. Defendant, through its agent, Southeastern Land Title ("SELT"), issued title insurance to Meritage on the real estate transaction. Attorney Kevin Early ("Early"), with assistance from SELT, conducted the closing. Defendant agreed to reimburse Meritage for any losses arising from Early's fraud or dishonesty in handling Meritage's funds or documents in connection with the closing.

The transaction was closed based on a Purchase and Sale Agreement ("Final PSA") dated December 21, 2005, which was signed by Lewis, the Kreamers, and the real estate broker. Before that transaction closed, there were two uncompleted

[1] In the Summary Judgment Order, the Court provided an extensive overview of the facts. Only a brief factual background, relevant to the Motion for Reconsideration, is recounted here.

prior purchase and sale agreements ("First" and "Second PSAs"), and one amended agreement ("Amended Second PSA"), relating to the same property, none of which was ever closed. The earlier agreements involved different purchasers, different purchase values, and different financial arrangements. The differences between these agreements form the basis for the FDIC's contention that, because each signatory to these agreements had knowledge of these uncompleted agreements, they had to have known they were in a scheme to defraud Meritage.

The First PSA is dated November 7, 2005, and it lists the buyer as Heritage Real Estate Investments, LLC ("Heritage"). Lindsay Briggs ("Briggs") signed the agreement as the manager for Heritage, and the Kreamers signed as the sellers. The PSA states the purchase price as $425,000. The record shows that the First PSA was in SELT's files and that it was not in Meritage's or Early's files.

The Kreamers and Briggs executed the Second PSA on November 17, 2005, with Briggs again signing as manager for Heritage. On the signature page section for the buyers, Heritage is labeled the "Assignor." Lewis is listed as the "Assignee." The purchase price is $608,000. The sale was contingent on the buyer's ability to obtain a mortgage loan for 100% of the purchase price of the property, and, pursuant to a special stipulation, was "subject to appraisal to meet or

exceed contract sales price." Another special stipulation stated: "Seller and Heritage Real Estate Investments, LLC acknowledge and agree that Heritage Real Estate Investments, LLC has the right to assign this contract to Buyer, Anthony Lewis." The record shows that the Second PSA was in SELT's files and in Meritage's files, and there is testimony indicating that it also was found in Early's files.[2]

Also on November 17, 2005, Briggs, Lewis, and the Kreamers executed an amendment to the Second PSA, executed by the same individuals who signed the Second PSA. The Amended Second PSA provided that Heritage "shall receive an assignment fee of $60,000 paid by Seller," which would be billed at the closing. The amendment further provided that the seller would pay a "repair and upgrade allowance of $123,000" to R & N Investments & Development, Inc., which would be billed at closing. The record shows that the Amended Second PSA was in

[2] The contents of Early's files are not clearly established in the record. At the time of the transaction at issue, Early's and SELT's offices were located in the same building. At some point after 2006, Early vacated the building. SELT's principal testified that the building manager found two or three boxes of files in Early's old office space and gave the boxes to SELT. SELT retained the boxes and produced some documents in this litigation from those boxes. SELT's principal testified that she found the Second PSA in the boxes. This is the only evidence that the Second PSA was ever in Early's possession.

SELT's files, and there is testimony indicating that it also was found in Early's files.[3] The Amended Second PSA was not in Meritage's files.

The Final PSA, which was the basis for the closed transaction, is dated December 21, 2005. This agreement provided that Lewis, and only Lewis, was the buyer of the Property, and that he would purchase the property from the Kreamers for $608,000. Like the Second PSA, the Final PSA stated that the sale was contingent on Lewis receiving a mortgage loan for 100% of the sale price, and that it was "subject to appraisal to meet or exceed contract sales price." For the first time, Early was designated as the closing attorney who would close the transaction. Urban Investment Group, LLC ("Urban") was to pay all closing costs not to exceed 3% of the purchase price, and was to receive a consulting fee of $183,000. In a handwritten, initialed amendment dated December 27, 2005, the Final PSA further stated that the seller would credit $2,000 to Urban upon closing.

Meritage approved Lewis for two mortgage loans to purchase the property: one for $486,400 and another for $121,600, for a total loan of $608,000. Meritage issued identical closing instructions for the two loans which provided a series of instructions to Early that had to be satisfied before Meritage would disburse the

---

[3] As with the Second PSA, SELT's principal testified that she found the Amended Second PSA in the boxes she believed were Early's. This is the only evidence that the Amended Second PSA was ever in Early's possession.

mortgage loan funds. The instructions indicated what forms and documentation would have to be submitted by the borrower and closing attorney and what changes to the transaction structure would have first to be approved by Meritage. They also stated that two separate HUD-1 forms would have to be created for the two separate mortgage loans funded by Meritage. All payees were required to be identified, and all non-recurring costs paid by the seller were required to be separately stated rather than treated as a lump sum payment. Early was directed to certify a final HUD-1 for each loan.

At Early's direction, SELT prepared the HUD-1 forms for the closing, based on the Final PSA, Meritage's closing instructions, and consultations with Early and Meritage. SELT prepared a draft HUD-1 and submitted it to Meritage for review, corrections, and approval. The draft HUD-1 stated on line 518 that a consulting fee of $157,003.29 would be paid to Urban. Meritage's representative checked the form and placed checkmarks next to various figures, and noted that one of the fees for the borrower's credit report needed revision. The form was returned to SELT with the statement that the HUD-1 had been reviewed and that it required revision. A later HUD-1 was sent to SELT indicating that Meritage had reviewed and approved the form. SELT then prepared the final HUD-1 that was used at the

closing. The Kreamers, Lewis, and Early each signed the final HUD-1. That form also disclosed a $157,003.29 consulting fee to Urban.

On December 22, 2005, Defendant issued "closing protection letters" to Meritage in connection with each mortgage. In the letters, Defendant agreed to reimburse Meritage for its losses resulting from "fraud or dishonesty" by Early in connection with the closing of the mortgages.

The two mortgage loans were finalized, and closing occurred, on December 30, 2005. Urban issued to Early an invoice dated December 30, 2005, for $183,000 for consulting services. The invoice directed Early to direct the funds to Ramola Nair, who was the principal of Urban as well as Heritage, the listed buyer from the First and Second PSAs. A domestic wire receipt indicates that $157,003.29 was wired to Ramola Nair on January 3, 2006. This equals the consulting fees due to Urban disclosed in the HUD-1, but was $25,996 less than the consulting fees owed under the Third PSA.

B. <u>Summary Judgment Order</u>

On May 23, 2011, Defendant moved for summary judgment on various grounds, including that the record did not contain evidence establishing that Early

committed fraud against Meritage.[4] The parties did not dispute that Defendant's liability turned on whether Early had committed fraud under Georgia law. To survive summary judgment, Plaintiff thus was required to show that the record contained evidence that: (1) Early made misrepresentations or omissions; (2) at the time he knew they were false; (3) he made them with the intention and purpose of deceiving Meritage (i.e., with scienter); (4) Meritage relied on the misrepresentations or omissions; and (5) Meritage sustained damages as the proximate result of their having been made. (See Summary Judgment Order [61] at 36–37 (citing Ardis v. Fairhaven Funeral Home & Crematory, Inc., 718 S.E.2d 843, 846 (Ga. Ct. App. 2011)).)

In the Summary Judgment Order, the Court found that the record lacked sufficient evidence of either scienter by Early or reliance by Meritage. As for scienter, Plaintiff argued that a jury could infer that Early intended to deceive Meritage because (i) Early disbursed the $157,003.29 "consulting fee" to Ramona Nair, instead of Urban, as identified on the HUD-1, and (ii) Early was in

[4] Defendant also argued that Plaintiff lacked standing and was not the real party in interest and that Defendant could not be vicariously liable to Plaintiff. In the Summary Judgment Order, the Court found that Plaintiff did have standing and was the real party in interest. The Court also granted Defendant summary judgment on Plaintiff's vicarious liability claim. These rulings are not at issue in the Motion for Reconsideration.

possession of all of the PSAs, which show that the transaction was a fraudulent "flip."[5] The Court found that these arguments did not support a finding of scienter because the payment of the fee to Nair, who was Urban's principal, did not show any intent to deceive, and the mere possession of the PSAs was not sufficient to show Early's state of mind. The Court found that Plaintiff's arguments were too speculative and conjectural to survive summary judgment because no reasonable juror could find for Plaintiff on the fraud claim. As for reliance, the Court found that the record did not contain any evidence of Meritage's internal loan approval policies and, therefore, did not support Plaintiff's argument that Meritage would have rejected the loan if Early had provided Meritage additional information. Based on the lack of record evidence supporting fraud, the Court granted summary judgment in favor of Defendant.

C. Plaintiff's Motion for Reconsideration

In its Motion for Reconsideration, Plaintiff argues that the Court erred by finding that Plaintiff's arguments of fraud, based on Early's possession of the PSAs and the payment of the fee to Nair, were speculative rather than inferential.

[5] Evaluating Plaintiff's arguments regarding Early's state of mind was made difficult by Plaintiff because, in its brief opposing summary judgment, Plaintiff referred to Early and SELT as one entity called "Early/SELT." The record clearly shows, and the Court found, that Early and SELT were independent of one another. Plaintiff does not dispute that finding in the Motion for Reconsideration.

Plaintiff further contends that the Court ignored the "GA-56." The GA-56 is a bulletin, dated in 1998 and amended in 2001, that Defendant authored and issued to SELT. It provides, in pertinent part,

> We are encountering an increasing number of contemporaneous sales transactions, or "flips," whereby the same piece of property is being sold twice on the same day (or soon thereafter). Many of these transactions are irregular, and even fraudulent, because of the inflated price of the second sale, and hence a larger loan than justified is obtained. . . . In addition, you must give the lender a separate notification of the "flip" and obtain their written authorization to proceed with the closing, before obligating yourself to issue of our loan policies.

(Pl.'s Br. [63-1] at 5 (quoting Pl.'s Ex. 1 [44-3]).)

## II. DISCUSSION

### A. Legal Standard

"A motion for reconsideration made after final judgment falls within the ambit of either Rule 59(e) (motion to alter or amend a judgment) or Rule 60(b) (motion for relief from judgment or order)." Region 8 Forest Serv. Timber Purchasers Council v. Alcock, 993 F.2d 800, 806 n.5 (11th Cir. 1993).[6] Motions

[6] Plaintiff did not move for relief under Federal Rule of Civil Procedure 60(b). Rule 60(b) provides for limited circumstances under which a district court will relieve a party from a final judgment or order. Fed. R. Civ. P. 60(b). These include "mistake, inadvertence, surprise, or excusable neglect," newly discovered evidence, fraud, that the judgment is void, or that the judgment has been satisfied or is no longer applicable. Id. None of these circumstances apply here and

for reconsideration under either Rule 59(e) or Rule 60(b) are left to the sound discretion of the district court. See id. at 806.

Motions for reconsideration under Rule 59(e) are only appropriate where there is newly-discovered evidence[7] or a need to correct a manifest error of law or fact. See Hood v. Perdue, 300 F. App'x 699, 700 (11th Cir. 2008) (citing Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs, 916 F. Supp. 1557, 1560 (N.D. Ga. 1995), aff'd, 87 F.3d 1242 (11th Cir. 1996)); Arthur, 500 F.3d at 1343 ("The only grounds for granting [a Rule 59] motion are newly-discovered evidence or manifest errors of law or fact."); Jersawitz v. People TV, 71 F. Supp. 2d 1330, 1344 (N.D. Ga. 1999). A motion for reconsideration should not be used to present the Court with arguments already heard and dismissed, or to offer new legal theories or evidence that could have been presented in the previously-filed motion. See Arthur, 500 F.3d at 1343; O'Neal v. Kennamer, 958

---

Plaintiff has not presented any grounds to justify granting relief under Rule 60(b) even if Plaintiff had asserted a motion under this rule.

[7] Evidence that could have been discovered and presented on the previously-filed motion is not newly discovered. See Arthur v. King, 500 F.3d 1335, 1343-44 (11th Cir. 2007); see also Mays v. U.S. Postal Serv., 122 F.3d 43, 46 (11th Cir. 1997) ("We join those circuits in holding that where a party attempts to introduce previously unsubmitted evidence on a motion to reconsider, the court should not grant the motion absent some showing that the evidence was not available during the pendency of the motion.").

F.2d 1044, 1047 (11th Cir. 1992); Bryan v. Murphy, 246 F. Supp. 2d 1256, 1259 (N.D. Ga. 2003); see also Jones v. S. Pan Servs., 450 F. App'x 860, 863 (11th Cir. 2012) ("A motion to alter or amend a judgment cannot be used to relitigate old matters, raise arguments, or present evidence that could have been raised prior to the entry of judgment."); Pres. Endangered Areas, 916 F. Supp. at 1560 ("A motion for reconsideration is not an opportunity for the moving party and their counsel to instruct the court on how the court 'could have done it better' the first time.").

B. Analysis

Plaintiff's Motion for Reconsideration does not present any newly-discovered evidence, and Plaintiff does not make any arguments that it did not make in its original opposition to Defendant's motion for summary judgment. Plaintiff's Motion for Reconsideration is thus unsupported and, for that reason alone, is required be denied. See Hood, 300 F. App'x at 700.

The Court notes further, however, that Plaintiff's principal argument in support of the Motion for Reconsideration—that a juror could make a reasonable inference of scienter by Early—is based on factual assertions that are not supported by the record. First, Plaintiff states that Early was in possession of all of the PSAs. The record, however, shows that Early, at most, was in possession only of the

Second, Amended Second, and Final PSAs. (See Hibbert Dep. [44-10] at 88 (stating that First PSA "was not in the attorney's record").) Except for the Amended Second PSA, Meritage was in possession of the same documents.[8] Second, Plaintiff argues that Early was in possession of the GA-56, which shows that Early was familiar with "flips." The record does not show that Early was ever in possession of the GA-56.[9] (See id. at 111 (stating that SELT, not Early, received the GA-56).) As the Court found in the Summary Judgment Order, the record does not support an inference that Early acted with scienter.[10] Defendant

[8] The fact that Meritage was in possession of multiple PSAs, showing the questionable "consulting fee," is sufficient to show that Meritage was at least on inquiry notice of an irregularity with the transaction. As Defendant argued in its motion for summary judgment, under Georgia law, a plaintiff who has "[n]otice sufficient to excite attention" of a potential fraud has a duty to investigate. See Bickerstaff Real Estate Mgmt., LLC v. Hanners, 665 S.E.2d 705, 709–10 (Ga. Ct. App. 2008). A failure to investigate precludes, as a matter of law, a finding of reasonable reliance by the plaintiff. Id. Plaintiff here failed to address this argument either in its opposition to the motion for summary judgment or in its Motion for Reconsideration.

[9] Even if Early did have the GA-56, the relevance of the document is not clear. The GA-56 defines a "flip" as a property being sold twice on the same day. The record does not show that the transaction at issue here involved more than one sale of the property.

[10] Plaintiff characterizes the Summary Judgment Order as finding that the record supports multiple "inferences" regarding Early's state of mind, including that Early was "sloppy, negligent, rushed, overworked, incompetent, naïve, or gullible." (See Pl.'s Br. [63-1] (quoting Order [61] at 39).) The Court did not find that the record supports a finding of any one of these possibilities. The Court found that

remains entitled to summary judgment, and Plaintiff's Motion for Reconsideration is denied.[11]

## III. CONCLUSION

Accordingly, for the foregoing reasons,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Reconsideration of Summary Judgment Ruling [63] is **DENIED**.

**SO ORDERED** this 19th day of March, 2013.

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE

---

Plaintiff's interpretation of the scant evidence as supporting scienter was wildly speculative and that there was no basis to distinguish scienter from the many other possibilities. See CBS Broad., Inc. v. EchoStar Comm'ns Corp., 450 F.3d 505, 519 n. 25 (11th Cir. 2006) ("Where the circumstantial evidence and reasonable inferences drawn therefrom create a genuine issue of material fact for trial, summary judgment is improper. However, an inference based on speculation and conjecture is not reasonable." (quoting Chapman v. Am. Cyanamid Co., 861 F.2d 1515, 1518–19 (11th Cir.1988) (internal citation omitted))).

[11] Because the Court finds that the record does not support a finding of scienter, the Court does not address Plaintiff's arguments regarding reliance. As noted above, however, the Court would be required to find no reliance by Meritage here because the record shows that Meritage was on inquiry notice of the alleged "flip." See Bickerstaff, 665 S.E.2d at 709–10. As reliance is an element of the fraud claim, this alone would entitle Defendant to summary judgment.